1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PATRICK S DRAGOS,

                              Plaintiff,

        v.

MICHAEL G CORNEA, et al.,

                              Defendants.

Case No. C19-1338 JCC-TLF

ORDER ON PLAINTIFF'S MOTION IN LIMINE

        This matter comes before the Court on Plaintiff's Motion in Limine to Exclude Bradley Probst. Dkts. 65, 70. Plaintiff argues that evidence to be offered by a defense expert witness, Bradley Probst, is inadmissible under FREV 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Dkt. 70. In addition, plaintiff argues that even if the Court decides the FREV 702 criteria are met, the evidence should nonetheless be excluded as more prejudicial than probative under FREV 403. *Id.*

**A.  FACTS**

        Plaintiff brings this negligence action alleging that he suffered significant injuries arising from an automobile collision with defendant, occurring in Seattle, on October 8, 2016. Dkt. 1-1. In the Answer, the defense admits they rear-ended plaintiff's vehicle. Dkt. 39, Amended Answer, at 2, ll. 10-11.

        Plaintiff's motion in limine challenges expert evidence defendants seek to have the jury consider – the proffered expert is Bradley Probst, whose proposed testimony

1   would provide information to the jury about biomechanical forces. Dkt. 70, Defendant

2   Cornea's Response in Opposition to Plaintiff's Motion in Limine, at 2, ll. 9-15; Dkt. 72,

3   Decl. of Bradley Probst, at 6-8, 14-15, 23 ¶¶ 8-11, 16, 18.

4   According to the defense, Bradley Probst would not offer medical evidence. Dkt.

5   70 at 6-10; Dkt. 72 at 7. The defense has provided the expert report and declaration of

6   Bradley Probst. Dkt. 72, 72-1. The defendant contends that Bradley Probst is qualified

7   to give relevant opinion evidence concerning biomechanics of a collision, and asserts

8   this would be probative to a material issue in this case – "to explain the biomechanics of

9   the subject accident, as they relate to Plaintiff's alleged hip injury." Dkt. 70 at 11. And,

10  the defendant contends that if the Court excludes the expert evidence of Probst, then

11  the Court must also exclude plaintiff's testimony concerning subjective assessment of

12  the force of the impact. Dkt. 70 at 12-13.

13  As described by Probst, "[m]y methodology in the Dragos matter was to evaluate

14  the severity of the subject incident in terms of the forces and accelerations experiences

15  [sic] by the Dragos vehicle, relate those to the magnitude and direction of forces applied

16  to Mr. Dragos during the subject incident, and evaluate his motion in the context of the

17  subject incident and available restraint and safety systems available in the subject

18  vehicle." Dkt. 72 at 6, ll. 16-20. In addition, Probst states that, "my opinions and analysis

19  pertain to these specific areas which deal with human movement (kinematics), forces

20  (kinetics), anatomy, and physiology"; and "I will not testify about whether there was any

21  injury to Mr. Dragos, but rather will testify about the forces and the biomechanical limits

22  involved in the subject motor vehicle collision, in consideration of the safety equipment

23  available and utilized by Mr. Dragos, and compare them to personal activities of daily

24

25

ORDER ON PLAINTIFF'S MOTION IN LIMINE - 2

1  living of Mr. Dragos as well as the general population." Dkt. 72 at 7-8, ¶ 10, ll. 13-15 and
2  ¶ 11.

3      **B. ANALYSIS**

4          Under FREV 702, as interpreted by the United States Supreme Court in a trio of
5  cases, the district court has broad discretion to assess relevance and reliability of expert
6  testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *General Elec. Co.*
7  *v. Joiner,* 522 U.S. 136 (1997); *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137
8  (1999). The trial court acts as a gatekeeper to ensure that proffered expert testimony is
9  both relevant and reliable. *Kumho Tire Co. Ltd. v. Carmichael,* at 147. Broad discretion
10  is given to the trial court to admit or exclude expert testimony; expert evidence is
11  properly excluded where "foundational facts demonstrating relevancy . . . are not
12  sufficiently established. . . ." *Trevino v. Gates,* 99 F.3d 911, 922 (9th Cir. 1996) (internal
13  citations omitted).

14          The district court screens the proffered expert evidence by determining under
15  FREV 104(a)[1] whether the expert evidence is scientific knowledge, and whether the
16  expert evidence will assist the trier of fact to understand or determine a fact that is in
17  issue for the specific claims and defenses. *Daubert v. Merrell Dow Pharm., Inc.*, at 592-
18  93. The inquiry must be connected to the specific facts presented in the case. *Kumho*
19  *Tire Co. Ltd. v. Carmichael,* at 150. Under Rule 702 of the Federal Rules of Evidence,
20  an expert witness who is "qualified. . . by knowledge, skill, experience, training, or
21  education," is allowed to testify when: "(a) the expert's scientific, technical, or other

22

23  ---
   [1] FREV 104(a) provides: "The court must decide any preliminary question about whether a witness is
   qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence
24  rules, except those on privilege."

25

specialized knowledge will help the trier of fact to understand the evidence or to

determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the

testimony is the product of reliable principles and methods; and (d) the expert has

reliably applied the principles and methods to the facts of the case." FREV 702.

The court conducts a "preliminary assessment of whether the reasoning or

methodology underlying the testimony is scientifically valid and of whether that

reasoning or methodology properly can be applied to the facts in issue. . . . Many

factors will bear on the inquiry, and . . . [there is not] a definitive checklist or test."

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-593.

The flexible inquiry boils down to "scientific validity – and thus the evidentiary

relevance and reliability – of the principles that underlie a proposed submission."

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-95. And, the district court

conducts this review of the proffered evidence on scientific evidence as well as

evidence that is "non-scientific" – "'technical' and 'other specialized knowledge'". *Kumho

Tire Co. Ltd. v. Carmichael*, at 526 U.S. 137, 141.

1. **The district court has discretion to decide admissibility on the record**
   **submitted by the parties without conducting an evidentiary hearing.**

Under FREV 104(a) and 702, the district court has broad latitude regarding the

decision whether to admit expert testimony, and also with respect to the procedures by

which to assess reliability. *United States v. Alatorre,* 222 F.3d 1098, 1104-1105 (9th Cir.

2000). "The district court has discretion whether to hold a *Daubert* hearing in

determining whether to admit expert testimony." *Millenkamp v. Davisco Foods Int'l, Inc.*,

562 F.3d 971, 979 (9th Cir. 2009). An evidentiary hearing will not be necessary if the

ORDER ON PLAINTIFF'S MOTION IN LIMINE - 4

parties' "briefing on [the expert's] scientific expertise and proposed testimony" gives the district court an "adequate record from which the court could make its ruling" on the admissibility of the proposed evidence. *Id.*

An evidentiary hearing on reliability under FREV 702 is not required if the proposed evidence is "unscientific speculation offered by a genuine scientist". *Kirstein v. Parks Corp.,* 159 F.3d 1065, 1067-1069 (7th Cir. 1998) (Even though the expert was well-qualified, he did not conduct any testing on the products in question and therefore trial court properly excluded the evidence after summary judgment briefing and declarations but without a full evidentiary hearing). If the district court excludes the evidence because it is more prejudicial than probative under FREV 403, this is an independent basis for excluding the proffered evidence, and the court is not required to also analyze the admissibility under FREV 702. *United State v. Benavidez-Benavidez,* 217 F.3d 720, 725-726 (9th Cir. 2000) (polygraph excluded as unduly prejudicial under ER 403).

If the district court holds an evidentiary hearing under FREV 702, it may occur before trial or during trial; in some circumstances, the expert's qualifications may be explored in voir dire of the witness during trial with the jury present. *See, United States v. Alatorre,* 222 F.3d 1098, 1104-1105 (9th Cir. 2000) (jury present). Although there is not a bright-line rule about the precise type of hearing or timing of the hearing, it is important for the district court to conduct an appropriate inquiry, and make a sufficient record of the findings and reasoning. *Barabin v. AstenJohnson, Inc.,* 740 F.3d 457, 463-464  (9th Cir. 2014) (en banc) (trial court abused its discretion by allowing expert testimony into evidence without first making a finding regarding relevancy or reliability

under *Daubert*; trial court's decision to admit expert evidence without any inquiry on the record was reversible error), *overruled on other grounds, U.S. v. Bacon,* 979 F.3d 766, 769-770 (9th Cir. 2020) (en banc) (interpreting 28 U.S.C. § 2106 and holding that the remedy for harmful error concerning FREV 702 may be a new trial, or a limited remand). In a close case, the district court should allow the jury to decide difficult factual issues, "relying on the safeguards of the adversary system . . . to 'attack[ ] shaky but admissible evidence.'" *Hardeman v. Monsanto Company,* 997 F.3d 941, 962 (9th Cir. 2021) (internal citations omitted).

In this case, during oral argument, the parties agreed no evidentiary hearing would be required. The parties have briefed the issue and provide a factual record that allows the court to analyze the issue of admissibility without conducting an evidentiary hearing. *Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 979 (9th Cir. 2009).

The defense has submitted an expert report and a declaration of the proposed expert witness. Dkt. 72, 72-1. The proffered expert's credentials are included in the report and the declaration. *Id.*

Mr. Probst's methodology, and the research findings and publications that the expert has relied upon, are described in detail (although some of the studies and articles referenced by Mr. Probst have not been included by the parties in the Court's record; the Court has provided those by hyperlink or by appendix). This is a sufficient factual record for the district court to conduct the inquiry required under FREV 104(a), 702, and 403.

Plaintiff argues Mr. Probst has insufficient educational credentials, experience, or training regarding medical areas of expertise for which only a medical doctor would be

1  qualified. Dkt. 65 at 5-13. The Court need not evaluate Mr. Probst's credentials

2  regarding the medical analysis, because even if the Court assumes -- for purposes of

3  analysis under FREV 104(a), 702, and 403 -- that Mr. Probst is a qualified expert, the

4  methodology he uses is not reliable.

5      2.  **The proffered evidence is not reliable and does not have scientific**

6        **validity.**

7       To determine if scientific testimony is based on scientific methodology and

8  reliable, this Court may consider the following non-exclusive factors: (1) whether the

9  theory or technique can be, and has been, tested; (2) whether the theory or technique

10  has been peer reviewed and published; (3) the known or potential error rate; and (4)

11  whether the theory or technique has been generally accepted in the relevant scientific

12  community. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 593-594

13  (1993). The Court's evaluation of the reliability of evidence "should be applied with a

14  'liberal thrust' favoring admission." *Hardeman v. Monsanto Company,* 997 F.3d 941,

15  960 (9th Cir. 2021) (quoting *Messick v. Novartis Pharms. Corp.,* 747 F.3d 1193, 1196

16  (9th Cir. 2014)).

17      •  **Mr. Probst's specific methodology for energy-based crush analysis is**

18        **not validated.**

19       In the present case, the defendant's expert witness, Bradley Probst, uses an

20  energy-based crush analysis to determine the change in speed of the defendant's

21  vehicle, and therefore energy imparted to the plaintiff's vehicle, at the time of the

22  collision. Dkt. 72-1, Exhibit A, at 2, 5-7. The change in speed, a parameter called Delta-

23  V, is then used to determine the magnitude of forces in the collision. *Id.*

24

25

ORDER ON PLAINTIFF'S MOTION IN LIMINE - 7

1    To perform the energy crush analysis, Mr. Probst: (1) selected a 10 m.p.h. trial

2  speed for the defendant's vehicle; (2) simulated the collision in EDCRASH, a vehicle

3  collision reconstruction software; (3) compared EDCRASH-generated estimates of the

4  deformation to the defendant's vehicle with photos of the actual damage to both

5  vehicles; and (4) concluded the defendant's vehicle was traveling less than 10 mph. *Id*;

6  *EDCRASH*, Engineering Dynamics Company, https://www.edccorp.com/index.php/hve-

7  software/edcrash (last visited July 6, 2021).  Mr. Probst then calculated the force

8  applied to the plaintiff's vehicle by the defendant's vehicle. Dkt. 72-1, Exhibit A, at 2, 7.

9    The Court must first evaluate whether an energy-based crush analysis is a

10  reliable methodology by which to determine the speed of vehicles in a collision. An

11  energy crush analysis uses the measured deformation to a vehicle to calculate the total

12  energy in a vehicle collision, the force applied to each vehicle, and ultimately the

13  change in speed of each vehicle, Delta-V, due to the collision. Shusake Numata, et al.

14  *Validation of Crush Energy Calculation Methods for Use in Accident Reconstructions by*

15  *Finite Element Analysis*, 6(2) SAE Int'l J. of Transp. Safety 133, 133-136 (2018)[2].

16    Automotive researchers and the National Highway Traffic Safety Administration

17  have used energy-based crush analysis to determine the energy in a collision event,

18  indicating the mathematical and physical principles of this type of analysis are widely

19  used and valid. *Terry Day & Randall Hargens, Difference Between EDCRASH and*

20  *CRASH3,* SAE Technical Paper (1985).

21

22

23

---

[2] This article was included as research relied on by Mr. Probst but it was not included in the record. The Court has provided it as an appendix to this order.

ORDER ON PLAINTIFF'S MOTION IN LIMINE - 8

1    In addition to the mathematical and scientific principles that underpin an expert's

2    testimony, the court must also evaluate the methodology used by the expert. *City of*

3    *Pomona v. SQM North America Corp.,* 750 F.3d 1036, 1044 (9th Cir. 2014). Mr. Probst

4    is not offering testimony based on his own calculations of the energy present in the

5    collision; instead, he determines the forces present in the collision by entering data into

6    EDCRASH, a collision reconstruction software. Dkt. 72-1 Exhibit A at 6-7. Therefore,

7    both EDCRASH and the method by which Mr. Probst uses EDCRASH to determine the

8    forces present in a collision must be validated.

9    The references provided in Mr. Probst's report generally establish the reliability of

10   EDCRASH to calculate Delta-V in one or two vehicle collisions if measured vehicle

11   deformation data is input to determine the severity of a collision. Engineering Dynamics

12   Corporation, EDCRASH Collision Reconstruction User Manual 1-1 (6th ed. 2006)[3]; see

13   Terry Day & Randall Hargens, *Further Validation of EDCRASH using RICSAC Staged*

14   *Collisions,* SAE Technical Paper (1989) (using staged collisions to validate collision

15   parameters calculated by EDCRASH)[4].

16   The Delta-V parameter, whether calculated by EDCRASH or another means, is

17   an accepted and validated measure of the severity of a collision. Dkt. 72-1, Exhibit A at

18   6-7. Published and peer-reviewed studies have shown that EDCRASH can reliably use

19   measured deformation data to calculate the severity of a vehicle collision and the

20

21   [3] https://www.edccorp.com/index.php/support-learning/library/manuals?download=255:edcrash

22   [4] The articles titled *Difference Between EDCRASH and CRASH3* and *Further Validation of EDCRASH Using RICSAC Staged Collisions* are available from the Engineering Dynamics Corporation, the creators
23   of the EDCRASH software, at https://www.edccorp.com/index.php/support-learning/library/validation. *See also,* https://www.edccorp.com/library/TechRefPdfs/EDC-0007.pdf

24

25

1    mathematics and science underlying these calculations are valid, peer reviewed, and

2    accepted by the vehicle collision analysis community.

3        Although the EDCRASH program is a validated method of determining the Delta-

4    V parameter in a vehicle collision, the EDCRASH validation performed by Day and

5    Hargens used vehicles with bumpers and safety features significantly different than

6    those found on the vehicles in the present case. The subject vehicles in the present

7    case are a 2011 Audi A8 and a 2015 Subaru Outback. Dkt. 72-1, Exhibit A at 15. The

8    vehicles used in the Day and Hargens EDCRASH validation study were a 1974

9    Chevrolet Malibu, 1974 Ford Pinto, 1974 Chevrolet Chevelle, 1974 Ford Torino, 1974

10   Honda Civic, and 1974 Volkswagen Rabbit. Terry Day & Randall Hargens, *Further

11   Validation of EDCRASH using RICSAC Staged Collisions,* SAE Technical Paper 139,

12   140 (1989).

13       Between 1974 and 2011, there have been changes in bumper design,

14   construction, and materials and passenger car construction has transitioned from a

15   body around a frame to a unibody construction. John Smith & Christina E. Smith,

16   *Advances in Understanding of Rear Impact Collision – Updating Physics, Biomechanics

17   and Statistics,* Trial Talk 21, 21 (2009)[5]. The changes in bumper and car construction

18   from 1974 to 2011 lower the overall confidence that EDCRASH is an adequately peer

19   reviewed software that has been sufficiently tested.

20       The defendant has provided no validation to support Mr. Probst's method of

21   using EDCRASH. The report provided by Mr. Probst shows he input a Delta-V value of

22   10 m.p.h. and used EDCRASH to calculate the deformation expected on the

23

24   [5] Dkt. 66, Ex. 5 at 149.

25

ORDER ON PLAINTIFF'S MOTION IN LIMINE - 10

defendant's Subaru Outback. Dkt. 72-1 Exhibit A at 6-7. Specifically, Mr. Probst states, "[a]n energy crush analysis indicates that a single 10 mile-per-hour flat barrier impact to the front of an exemplar Subaru Outback would result in significant and visibly noticeable crush…with a residual crush of 2.25 inches." *Id.* However, the accuracy and reliability of the EDCRASH program was established by inputting measured deformation data to calculate Delta-V and comparing the Delta-V output to measured vehicle velocities. *See* Terry Day & Randall Hargens, *Further Validation of EDCRASH using RICSAC Staged Collisions,* SAE Technical Paper (1989) (using EDCRASH to calculate collision parameters based on measured deformation data). Mr. Probst used EDCRASH to "reverse calculate" vehicle deformation from a selected Delta-V. Dkt. 72-1 Exhibit A at 6-7.

In addition to using EDCRASH in a way that is not validated, Mr. Probst is also using EDCRASH in a way that is not consistent with the EDCRASH program design. The report does not specify whether Mr. Probst is using the most recent EDCRASH version 7 and references the latest manual (edition 6) available from the Engineering Dynamics Corporation. Even assuming he is using the most recent version, Mr. Probst's report indicates he input a Delta-V and reviewed a damage profile produced by EDCRASH. Dkt. 72-1, Exhibit A, at 6. However, the EDCRASH user manual lists damage profiles as a program input and Delta-V as a program output. EDCRASH Collision Reconstruction User Manual 1-2 (6th ed. 2006). The manual also directs the user to assign the damage profiles to the vehicles to reconstruct the collision event. *Id.* at 5-12. The EDCRASH program does generate a damage profile report; however, the user manual states the calculated damage report is "very useful for confirming the

1   damage data were entered properly." *Id.* at 3-13. EDCRASH does not appear to be

2   designed to perform the analysis done by Mr. Probst, specifically the software is not

3   designed to calculate vehicle damage based on an input of Delta-V and the EDCRASH

4   user manual does not direct the use of the program in this fashion.

5          Furthermore, EDCRASH validation has been performed with physically

6   measured deformation and not deformation determined by photographs and repair

7   estimates. Mr. Probst's report states that "the severity of the incident was analyzed by

8   using photographic reproductions and available repair estimates of the subject Audi A8

9   and . . . Subaru Outback." Dkt. 72-1, Exhibit A, at 4. However, the validation study

10  performed by Day and Hargens used physically measured vehicle deformations that

11  resulted from staged two car collisions. Terry Day & Randall Hargens, *Further*

12  *Validation of EDCRASH using RICSAC Staged Collisions,* SAE Technical Paper 139,

13  139 (1989). The laboratory that performed the two car collisions used by Day and

14  Hargens was able to measure vehicle deformation to 1/10" accuracy. *See* Norris

15  Shoemaker, *Research Input for Computer Simulations of Automobile Collisions*, *Vol. II.,*

16  CALSPAN Corporation Advanced Technology Center (1978) (providing multiple

17  deformation measurements to 1/10" accuracy of vehicle deformation after staged

18  collisions)[6]. Given EDCRASH was validated using relatively precisely measured data, it

19  is impossible to conclude the program would perform accurate determinations of Delta-

20  V using inputs from a photo and repair bill.

21

22

23  ─────────────────────
    [6] This article was cited by a study that Mr. Probst references in his report. The parties have not included it
24  in the record, but the Court has provided it as an appendix to this order.

25

1    Mr. Probst contends it is accepted that photographs can provide precise

2  deformation data that can be used to effectively in collision analysis software. Dkt. 72 at

3  15. Included in his statements are the quotes from published works explaining that in

4  post-collision analysis "[a] comprehensive and objective determination of the vehicle-

5  related aspects is absolutely necessary, such as photographs of the vehicles involved

6  and a listing of damaged car parts" and "reconstructionist are occasionally asked to

7  determine deformation depths from one or more photographs." *Id.* These quotes make it

8  clear that photographs and repair information can be part of an analysis and may be the

9  only information available, but they do not establish photographs and repair bills alone

10  provide accurate enough information to achieve reliable results from EDCRASH or any

11  other collision reconstruction software.

12    Additionally, *Hiropoulos v. Juso,* cited by Mr. Probst, is unpersuasive and does

13  not support his contention that photo analysis provides sufficient data to reliably use

14  EDCRASH. In *Hiropoulos,* the accident analyst had access to dash cam footage of the

15  collision, an event data recorder from one of the vehicles, and photographs of the

16  vehicle damage. *Hiropoulos v. Juso,* No. 2:09-CV-307, 2011 WL 3273884, at *1 (D.

17  Nev. July 29, 2011). The decision in *Hiropoulos* to admit expert analysis of the collision

18  relied on the additional video and electronic data available to aid the investigator in the

19  absence of measured deformation. *Id.* at *3.

20    As described above, although the Supreme Court does not require the trial court

21  to follow a checklist, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579,

22  593-594 (1993), the Court considers: (1) whether the technique has been tested; (2) if

23  the technique has been peer reviewed; (3) the known or potential error rate; and (4)

24

25

whether the technique has been generally accepted in the relevant scientific community. *Id.* In this case, the EDCRASH program is weakly validated and used by Mr. Probst in a way inconsistent with the validation and user manual, therefore, the Court does not accept the program is adequately tested, peer reviewed, or accepted by the relevant scientific community. The program also does not have a known error rate when used to "reverse calculate" Delta-V from the observed vehicle damage. Therefore, the testimony of Bradley Probst based on EDCRASH calculations, as described in his report, does not meet the requirements of FREV 702 and should be excluded.

- **Mr. Probst's sideswipe analysis is not supported by relevant data; there is no known error rate; and variables are not accurately measurable.**

The report by Mr. Probst also contains a sideswipe analysis of the collision between the defendant's and plaintiff's vehicles. Dkt. 72-1, Exhibit A, at 7. The defendant's amended answer admits that the collision was a rear-end collision. Dkt. 39 at 2, ll. 10-11. Even if the defendant had not admitted this was a rear-end collision, Mr. Probst's method, like the energy crush analysis, also relies on the established principles of conservation of energy to calculate Delta-V from the energy present in the collision. Mark Bailey, et al. 104-6 *Data and Methods for Estimating the Severity of Minor Impacts,* J. of Passenger Cars 639, 640 (1995)[7]. One of the variables necessary to calculate the amount of energy in the collision at the time of impact is the deformation of the vehicles -- which is described as the "measured length of contact.". *Id.*; Amrit Toor,

---

[7] This article was cited by Mr. Probst but the parties have not included it in the record. The Court has filed it as an appendix to this order.

1    et al. *Practical Analysis Technique for Quantifying Sideswipe Collisions,* 108 J. of

2    Passenger Cars, 201, 217 (1999).

3          Additionally, one sideswipe collision analysis study referenced by Mr. Probst

4    measured vehicle damage to an accuracy of 1 cm and cautioned that analysis of the

5    vehicle damage has the potential to influence the accuracy of the analysis results. *See*

6    Amrit Toor, et al. *Practical Analysis Technique for Quantifying Sideswipe Collisions,* 108

7    J. of Passenger Cars, 201, 214 (1999)[8].

8          Mr. Probst, however, did not measure the vehicle damage or view the vehicles

9    personally. Instead, he reviewed photographs of the Plaintiff's and Defendant's vehicles

10   and reviewed repair bills. Dkt. 72-1, Exhibit A at 4. Using vehicle damage determined

11   from photographs and repair bills in an analysis that is susceptible to variances based

12   on imprecise damage determinations is not a tested, peer reviewed, or generally

13   accepted method nor is there a known or calculable error rate. Therefore, the factors

14   identified in *Daubert* are not met and the method of determining Delta-V using a

15   sideswipe analysis is not admissible. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509

16   U.S. 579, 593-594 (1993). While *Daubert* factors are not a checklist, the methodology is

17   unreliable because of the deficiencies of using photographs and repair estimates in a

18   sideswipe analysis to determine Delta-V.

19

20

21

22

23   ───────────────────
     [8] This article was cited by Mr. Probst but the parties have not included it in the record. The Court has filed
24   it as an appendix to this order.

25

ORDER ON PLAINTIFF'S MOTION IN LIMINE - 15

1

2

- **There is no data to support Mr. Probst's assumption of a constant rate of acceleration to calculate applied force**

3

4

5

6

7

The Delta-V value is integral to Mr. Probst's proposed testimony but is not the parameter used in causation analysis. The relevant portion of the collision analysis for purposes of analyzing whether it is relevant to causation, is the force applied to the Plaintiff's vehicles, which Mr. Probst describes in g-force, a measure of force as compared to the force exerted by the Earth's gravity. Dkt. 72-1, Exhibit A at 6.

8

9

10

11

12

To calculate the g-force experienced by the Plaintiff's vehicle, Mr. Probst assumes the Defendant's vehicle has a speed of 10 m.p.h. at the time of impact, the plaintiff's vehicle has a speed of 10 m.p.h. after the impact, and the plaintiff's vehicle's rate of acceleration is constant over 150 milliseconds. *Id.* This results in the Plaintiff's vehicle being subject to approximately 3.0 g's of force. *Id.*

13

14

15

16

17

18

19

20

21

But the assumption made by Mr. Probst that the lead vehicle in a rear-ending collision will accelerate at a constant rate is contradicted by the data obtained from collision reconstructions. Specifically, the CALSPAN Corporation data used in the Day and Hargens EDCRASH validation study includes accelerometer measurements of the front car in a rear end collision which show the acceleration is not constant. Norris Shoemaker, *Research Input for Computer Simulations of Automobile Collisions*, *Vol. II.,* 9-46 CALSPAN Corporation Advanced Technology Center (1978). The report by Mr. Probst does not explain why a constant acceleration was assumed. This is significant because the force, measured in g's[9], applied to the Plaintiff's vehicle is proportionate to

22

23

24

25

---

[9] Rhett Allain, *What is G-Force?*, Wired (June 6, 2012), https://www.wired.com/2012/06/what-is-a-g-force.

the acceleration of the Plaintiff's vehicle. The method used by Mr. Probst to calculate the g-force applied to the plaintiff's vehicle is contradicted by available data and is not supported by other peer reviewed methods, therefore, this method of calculating g-force does not meet the standards of FREV 702 and is not admissible.

In conclusion, when the Court considers the factors in the holistic approach used in *Daubert, Kumho Tire,* and other precedent, the Court concludes that Mr. Probst's proposed expert opinion evidence is "unscientific speculation", *Kirstein v. Parks Corp.,* 159 F.3d 1065, 1067-1069 (7th Cir. 1998), and the necessary foundation has not been presented.

3. **The proffered expert evidence is not relevant to the elements of negligence as defined by state law; even if relevant, it would be inadmissible under FREV 403.**

FREV 401 provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action."

To prove a negligence claim, a plaintiff must prove the existence of duty, breach, and injury; "and the breach of duty must be shown to be a proximate cause of the injury." *Baughn v. Honda Motor Co.*, 107 Wn.2d 127, 142 (1986). A cause is a proximate cause if, "in a natural and continuous sequence, unbroken by any new, independent cause, [it] produces the event, and without [it,] that event would not have occurred." *See Graham v. Pub. Emps. Mut. Ins. Co.*, 98 Wn.2d 533, 538 (1983). Proximate cause consists of both cause in fact -- the connection between the act and the injury -- and legal causation. *Baughn*, 107 Wn.2d 127 at 142. The question of cause

1    in fact is generally a question for the jury, unless the facts are undisputed and

2    reasonable minds could not differ, in which case cause in fact may be decided as a

3    matter of law by the court. *Id.*

4         In this case, the parties dispute whether Mr. Dragos's injuries have the required

5    causal relationship to the accident. Dkt. 65 at 1-2; Dkt. 70 at 10. The defense intends for

6    Mr. Probst's testimony to assist the jury in determining "if this specific accident caused

7    Plaintiff's specific injuries." Dkt. 70 at 11. Defendants assert Mr. Probst's testimony is

8    intended to opine only on the biomechanics of the impact experienced during the

9    accident and forces experienced in day-to-day life. Dkt. 70 at 7.

10        Foundational facts, connecting the scientific methodology to the material factual

11   issues in a specific case, are required in order for expert evidence to have relevancy.

12   *Trevino v. Gates,* 99 F.3d 911, 922 (9th Cir. 1996). As discussed above, the factual

13   foundation has not been provided, because: (1) the software used to provide Mr.

14   Probst's facts was validated with cars significantly different than those in the present

15   case; (2) the method by which the software was used was not validated; (3) the method

16   by which the software was used is contrary to the software design; and (4) the g-force

17   applied to the plaintiff's vehicle was calculated using unverified assumptions.

18        Yet, even if the evidence proposed by the defendant to be presented by Mr.

19   Probst would have some theoretical relevance (if the Court found there was a shaky

20   connection to the facts, but enough to establish some amount of relevance) to

21   causation, extent of injury, or damages, the evidence should still be excluded under

22

23

24

25

ORDER ON PLAINTIFF'S MOTION IN LIMINE - 18

FREV 104(a), FREV 403[10], and FREV 702 because it would not be helpful to the jury, would mislead the jury, and would be more prejudicial than probative. Because the evidence is not scientifically valid and the methodology is unreliable, it would only result in confusing the jury concerning how Mr. Probst's opinions relate to the issues of fact. Mr. Probst did not conduct any observation or testing on the specific cars involved in the collision that is the subject of plaintiff's lawsuit; and he does not offer a reliable explanation of how the studies he cites can be validly or reliably applied to the photographs and other information he reviewed in this case.

The Court does not need to reach plaintiff's argument about Mr. Probst's qualification; even if Mr. Probst has sufficient education, experience, and skill to give an opinion – in this case the opinion lacks a foundation and therefore is not relevant to any material issue of fact.

### 4. **Plaintiff's percipient witness testimony**

The defendants also contend that if the Court excludes the expert evidence of Probst, then the Court must also exclude plaintiff's testimony concerning subjective assessment of the force of the impact. Dkt. 70 at 12-13. The defense reasoning is unpersuasive – essentially the defense argues that Mr. Probst's testimony is the only plausible explanation of impact of a collision, and suggests plaintiff as a percipient witness cannot give the jury any accurate testimony about impact. Yet testimony of plaintiff, as a percipient witness to the events that occurred in real time when the collision of vehicles happened, would be relevant to each element of negligence

---

[10] Under FREV 403, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

ORDER ON PLAINTIFF'S MOTION IN LIMINE - 19

because it would help establish facts concerning the sequence of how the accident

evolved. Any risk of unfair prejudice -- about precise details concerning impact plaintiff

experienced -- may be mitigated by appropriate objections and cross-examination.

**C.** **CONCLUSION AND ORDER**

The plaintiff's motion to exclude the expert testimony and evidence proffered by

the defendant, submitted by Mr. Probst -- plaintiff's Motion in Limine (Dkt. 65) -- is

**GRANTED.** Any objection, for consideration by Judge Coughenour, to this order must

be served and filed within 14 days. FRCP 72(a).

Dated this 14th day of July, 2021.


*Theresa L. Fricke*

Theresa L. Fricke
United States Magistrate Judge